IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2014

**TARRENCE PARHAM v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 06-00017 Paula Skahan, Judge**

---

**No. W2013-01437-CCA-R3-PC - Filed December 17, 2014**

---

The petitioner, Tarrence Parham, appeals the post-conviction court's denial of his petition for post-conviction relief from his convictions for attempted second degree murder and reckless aggravated assault. On appeal, he argues that he received ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Rosalind Elizabeth Brown, Memphis, Tennessee, for the appellant, Tarrence Parham.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Morris, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of the attempted second degree murder and reckless aggravated assault of an eight-year-old girl and sentenced to an effective term of twenty years in the Department of Correction. State v. Tarrence Parham, No. W2009-00709-CCA-R3-CD, 2010 WL 2898785, at *1 (Tenn. Crim. App. July 26, 2010), perm. app. denied (Tenn. Nov. 10, 2010). On direct appeal, this court affirmed the judgments of the trial court after modifying to reflect that the petitioner's conviction for reckless aggravated assault was merged into his conviction for attempted second degree murder. Id. The Tennessee Supreme Court denied his application for permission to appeal. Id.

The underlying facts were recited by this court on direct appeal as follows:

> Shamika Nabors testified that on September 5, 2005, Labor Day, she was among a group of people congregating outside their apartments at the Barron Brook Apartments in the Orange Mound neighborhood of Memphis, Tennessee. The [petitioner], whom she called "Black," was also outside, and she heard him say that he was going to kill "these weak ho's and b----es[.]" At first she thought he was speaking to himself, but as she watched him, she realized that he was looking at a man named Philemon, who was sitting in a windowsill in the breezeway. Ms. Nabors pulled Philemon into her apartment and told him what the [petitioner] had said. Then, they returned outside, and Philemon resumed his seat on the windowsill. Five to ten minutes after she and Philemon returned, the [petitioner] walked away and then returned. He raised a silver revolver and fired one shot down the breezeway and two shots in the park area nearby. Ms. Nabors saw Philemon run down the breezeway towards the laundromat and leave the apartments. Ms. Nabors testified that the [petitioner] fired the first shot toward a utility box. She later learned that her two-year-old daughter had been near the box when the [petitioner] began shooting. Ms. Nabors testified that she froze when the [petitioner] began shooting. After the last shot, the [petitioner] left the apartments, and [the victim] ran for her mother. Ms. Nabors saw that the [petitioner] had shot [the victim] in the leg. She did not know where [the victim] was when she was shot, but she identified pictures of the green box with blood on it. She identified the [petitioner] as the shooter in a photographic lineup when she gave her statement to police and in the courtroom during her testimony.
>
> Ms. Nabors testified that she did not see or hear anyone threaten or fight with the [petitioner] prior to the shooting. She did not see anyone else with a gun nor did she see anyone "raise up their shirt at [the petitioner]." Ms. Nabors said that Philemon was neither facing the [petitioner] nor did he have his back to the [petitioner] when the [petitioner] began firing, but after the first shot, Philemon ran away. She did not see a young man give the [petitioner] a gun. Ms. Nabors testified that no one shot back at the [petitioner]. She recalled that several of the men in the group were smoking marijuana, including Philemon, but she did not hear the [petitioner] say anything about the marijuana.
>
> On cross-examination, Ms. Nabors testified that there were approximately fifteen people outside that day. She said that she had seen the [petitioner] and Philemon together before. She saw the [petitioner] in a

wheelchair several days before the shooting, but she said he was not in a wheelchair that day. His leg was bandaged, and it was difficult for him to run. Ms. Nabors testified that the [petitioner] ran in the same direction as Philemon. She said that Philemon did not live in the apartment complex.

On re-direct examination, Ms. Nabors testified that she believed the [petitioner] was shooting at Philemon.

Tosha Keller testified that on September 5, 2005, she and her family and friends were gathered outside of her apartment preparing for a barbecue. A man named Philemon was sitting in the window of an apartment unit, rolling a marijuana cigarette, when the [petitioner] approached him. Ms. Keller said that the [petitioner] "said some things to Philemon. Philemon just kept on doing what he was doing." She heard another man tell the [petitioner] "that he couldn't smoke the marijuana cigar." Ms. Keller did not see anyone threaten or yell at the [petitioner]. The [petitioner] walked down to the end of the apartment unit, but three to five seconds later, he returned and began shooting. Ms. Keller was standing five feet away from Philemon, and she believed that the [petitioner] aimed at him. She testified that the [petitioner] fired one shot before Philemon began running away. The [petitioner] chased after him and fired two more shots. After Philemon and the [petitioner] ran out of her sight, she heard two more shots. Ms. Keller testified that the [petitioner] fired a total of five shots, three that she saw and two that she heard. Ms. Keller assumed that the [petitioner] fired the shots that she heard because no one was returning fire. She said that she did not see anyone else with a gun that day. Ms. Keller testified that she remembered the gun being black, but she agreed that her memory was better on the day of the shooting when she gave a statement to the police that the gun was a chrome revolver.

Ms. Keller testified that after the shooting, she and her neighbors were trying to find the children that had been playing near the laundromat. She had seen [the victim] running when the shooting began, but [the victim] went back to get Ms. Nabors's two-year-old daughter, with whom she had been playing. When the shooting was over, Ms. Keller saw [the victim] walking towards her carrying the two-year-old. [The victim] said that she was hurting, and Ms. Keller realized that she had been shot in the leg.

Ms. Keller testified that the [petitioner] moved into the apartment complex two to three months prior to the shooting. She said that "it was chaos" after he moved in. She recalled seeing him in a wheelchair, with casts

on his legs, for a period of approximately two weeks. Ms. Keller testified that on September 5, the [petitioner] did not have casts and appeared able-bodied. She said that she knew that someone had shot at the [petitioner]'s apartment because she saw the bullet holes in the door the next day, but she did not testify as to what exact day she saw the bullet holes.

On cross-examination, Ms. Keller testified that she could not remember the color of the gun. She remembered telling the police that she saw the [petitioner] shoot once and then heard another shot, but she believed that he shot more than twice. Ms. Keller said that she saw another man walking with the [petitioner], but she did not know him. She said that the man was not [the victim]'s uncle. Ms. Keller clarified that she saw the bullet holes in the [petitioner]'s apartment door on September 6, 2005, the day after the shooting. She recalled that there were seven to eight adults outside on September 5, and she did not remember how many children were on the playground nearby.

Sharon Williams testified that the [petitioner], whose nickname was "Black," moved into the Barron Brook apartment complex two to three months before the shooting on September 5, 2005. On that day, she was outside with her neighbors when she heard the [petitioner] say "he [was tired] of them and he [was] going to kill him a mother f---ing n----r" as he was walking towards the end of the apartment unit. Less than a minute later, the [petitioner] turned around and began shooting. Ms. Williams testified that he fired once, chased after a young man, and fired twice more. She said the gun was a silver revolver. Ms. Williams did not see anyone threaten the [petitioner] nor did she see the young man who the [petitioner] chased ever lift up his shirt or draw a weapon.

Ms. Williams said that someone shot at the apartment where the [petitioner] was staying one to two weeks before September 5, 2005. She heard him say that "[h]e had got into it with some guys over there[,] and they had shot somebody else's apartment up looking for him." A couple of nights before the September 5 shooting, the [petitioner] was in a wheelchair with soft casts on his feet. Ms. Williams had heard that the [petitioner] was injured when he jumped from a second story. Ms. Williams testified that the [petitioner] said that he did not care who he shot, "[h]e [would] kill your momma, your grandmomma, babies and kids, because they don't even have no [sic] business in the way whatsoever." Ms. Williams testified that on September 5, there were five to six people outside. She said that if Philemon had drawn a weapon, she would have seen it.

Kathy Smith testified that on September 5, 2005, she was standing in her doorway while her neighbors were barbecuing outside. The [petitioner] asked her for a cigarette. She gave him one, which he lit. As he walked away, he said, "I'm sick of these b---h a---ed n-----s. I'm going to kill me somebody today." The [petitioner] turned around and started shooting as he walked by her. Ms. Smith told him to stop shooting because of all the children outside. She started calling for her daughter. When she saw [the victim], she was bleeding. [The victim] said, "[M]omma, I don't want to die."

Ms. Smith testified that her brother, Travis, was not at the apartment complex when the [petitioner] began shooting. He came later that day, after [the victim] was in an ambulance. She said that she did not see anyone threaten the [petitioner], raise up their shirts, or shoot back at the [petitioner]. Ms. Smith went to the hospital with [the victim], where the doctors performed surgery to remove a bullet from her left leg.

On cross-examination, Ms. Smith testified that she did not know where the [petitioner] had gotten the gun. She said that he did not go into an apartment when he was walking away from the crowd nor was he walking with anyone else. She saw the [petitioner] fire two shots before he went out of her sight. Ms. Smith said that he was limping.

[The victim] testified that she was eleven years old at the time of trial. On September 5, 2005, she had been playing with Ms. Nabors's two-year-old daughter. They were sitting on "the green box" when she heard the shooting. She ran into the laundromat but then went back to the green box and moved her friend out of the way. At that point, [the victim] thought that she had a seizure, which she defined as what happens when people are shaking. She began walking towards her mother when she looked down and saw that she was bleeding. She went to the hospital where doctors removed the bullet. [The victim] said that she could run and play at the time of trial.

On cross-examination, [the victim] said that she saw the shooter but did not see him well.

Officer Parz Boyce, of the Memphis Police Department, testified that he was one of the first officers to make the scene at the Barron Brook Apartments on September 5, 2005. When he arrived, he saw a five or

six-year-old girl[1] lying on the steps with a bloody towel. Officer Boyce said the girl told him that "Black" had shot her. He knew who "Black" was based on his experience working in the neighborhood. Two other individuals also told him that "Black" was the shooter and gave him descriptions of his clothing. Officer Boyce put out a broadcast giving the name and description of the shooter. He and another officer taped off the crime scene.

On cross-examination, Officer Boyce testified that he knew the [petitioner] as "Black," and the [petitioner] was the only person he knew that went by that nickname. In the course of gathering information, he learned that [the victim] was not the intended victim, but he was unable to ascertain who the intended victim was.

The parties stipulated to the admission into evidence of a bloody towel, [the victim]'s sandal, and a pair of sunglasses collected by a crime scene officer at the Barron Brook Apartments. They further stipulated to the admission into evidence of the bullet recovered from [the victim]'s leg.

Officer Ravell Slayton, of the Memphis Police Department, testified that he made the scene at the Barron Brook Apartments on September 5, 2005. He received information that the shooter had fled on foot, wearing a red shirt and white shorts, and he left the scene to search for the shooter. Officer Slayton learned that the shooter had jumped into a black pickup truck. He located a suspicious black truck and pulled it over. The driver admitted that he had dropped the shooter off at a laundromat at Lamar Avenue and Semmes Street. Officer Slayton remained with the driver while his partner went to the laundromat. When his partner returned, the [petitioner] was in the backseat of the patrol car. Officer Slayton identified a picture of the [petitioner] wearing a red shirt and white shorts, with "old cast[s]" around his ankles.

Sergeant Vernon Vanburen, of the Memphis Police Department, testified that he processed the crime scene at the Barron Brook Apartments. He did not find a weapon.

The [petitioner] testified that he had prior convictions for reckless homicide, theft over $500, and aggravated burglary. He said that he moved to the Barron Brook Apartments one and a half months before September 5, 2005. He moved there because he had "kin folks" in the neighborhood, but

[1] The record indicates that [the victim] was eight years old at the time.

some of the men in the apartment "had words" with him about staying there when he was not from the neighborhood. The [petitioner] testified that on either August 26 or 28, 2005, he broke both of his feet. The personnel at the Regional Medical Center gave him temporary casts and pain medication. He had to use a wheelchair to get around. On August 31, someone fired shots at his apartment. He filed a police report, but the police did not find who did it. By September 5, 2005, he could walk but not run.

The [petitioner] testified that on that day, he was walking to his apartment when he saw Philemon, one of the men with whom he had previously "had words" and who he believed was responsible for shooting his apartment. The [petitioner] said he "was already paranoid" because of the August 31 incident. He claimed that he did not say anything about killing anyone, but Philemon said that he "was going to kill one of these 'B's or H's' or something like that." The [petitioner] asked him to whom was he speaking, and Philemon "jumped up" and reached under his shirt. The [petitioner] believed that Philemon was reaching for a weapon, so he fired one shot towards him. The [petitioner] said that he was not trying to kill Philemon, but he was protecting himself. He explained that he immediately reacted, contrary to the other witnesses' testimony that several minutes passed. When Philemon ran away, the [petitioner] was afraid he would return, so he went to the laundromat at Lamar Avenue and Semmes Street because he knew the owners. He did not realize that he had shot anyone until the police officer picked him up at the laundromat. The [petitioner] admitted that he told the police that he had thrown the gun into a garbage can on Semmes Street. He said that he actually returned the gun to the person from whom he had gotten it, Kathy Smith's brother, Travis.

On cross-examination, the [petitioner] testified that Travis Smith[2] gave him the gun approximately two hours prior to the shooting, and the [petitioner] returned it to him immediately after he fled from the scene. He said that he did not call the police to report that he had shot at someone in self-defense because the police did not help him when he called them about someone shooting at his apartment.

The state called Travis Lloyd Alston as a rebuttal witness. Mr. Alston testified that he was Kathy Smith's brother. He said that he did not give the [petitioner] a gun on September 5, 2005. He further said that he would not

[2] We assume the [petitioner] was referring to Travis Alston.

> have allowed the [petitioner] to give him the gun with which the [petitioner] had shot his niece. Mr. Alston said that "[he] would have retaliated" against the [petitioner]. Mr. Alston knew the [petitioner] only as "Black." He said that if they had been friends, he would have known the [petitioner]'s full name.

Id. at *1-5.

The petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. Although the petitioner raised in his petitions, among other things, numerous allegations of ineffective assistance of counsel, on appeal he limits himself to arguing that counsel was ineffective for: (1) failing to investigate and prepare his defense; (2) repeatedly referring to him by his street name instead of proper name, telling the jurors in his opening statement that they probably would not like the petitioner, and exhibiting inappropriate behavior toward a juror; and (3) failing to raise a double jeopardy issue on appeal about his being convicted of attempted second degree murder and reckless aggravated assault. We will, thus, confine our summary of the evidentiary hearing to testimony that is relevant to these issues.

At the hearing, the petitioner testified that he was first represented by original counsel whose representation was terminated when the petitioner filed a complaint against him with the Board of Professional Responsibility. Thereafter, trial counsel was assigned to the petitioner's case.

The petitioner testified that he was not prepared for trial because he and trial counsel only met one time when he came to court. He claimed that he tried to get trial counsel to visit him at the jail so they could review the case, but counsel never would. He acknowledged that original counsel obtained a private investigator on his behalf, but he said that he only met with her one time. He claimed that he gave the investigator specific names of people he wanted her to investigate, but he did not hear from her again or see any products of her investigation. He later found out that the investigator had taken photographs of the crime scene, but he did not see those prior to trial. Had he known about the photographs beforehand, he would have wanted some taken at different angles that would have better allowed him to show that there was no way that the bullet he fired could have been the one that hit the victim. He stated that there were fifteen to twenty people around the scene at the time of the incident, but the investigator only talked to the people identified as witnesses by the State. He claimed that the State's witnesses testified inconsistently with what they had told the police.

The petitioner stated that he never saw the defense file, which included witness

statements, until his post-conviction counsel showed it to him. The petitioner alleged that trial counsel did not do any additional investigation after he took over the case from original counsel.

The petitioner testified that, at the time of the shooting, he had a broken ankle and heel and was wearing casts. He learned from post-conviction counsel that one of the State's witnesses, Sharon Williams, had given a statement to the investigator in which she said that she saw the petitioner running behind the victim and that he did not have a cast on. However, the petitioner said that he was unable to run on that date due to his injuries and cast. He explained that his feet were injured when he was intoxicated and attempted to intervene in a situation with one of the victim's mother's other children and was pushed over the railing at the apartments. He said that early the next morning, after he had returned from the hospital, shots were fired at his apartment. He wanted the investigator to obtain the 911 recording from that incident and take pictures of the bullet holes in his apartment. He wanted this information in order to establish that his actions on the night of the incident were the result of his fearing for his life.

The petitioner testified that trial counsel referred to him by his nickname, "Black," during his opening statement. However, he did not tell counsel of his displeasure with his doing so until later. He acknowledged that the witnesses brought up the name "Black" during the trial.

The petitioner also complained of an incident after jury selection when trial counsel confronted a juror about discussing the case outside the courtroom. The petitioner felt that counsel's actions could have had an impact on the outcome of the case. He recalled that the juror "turned red" and denied that trial counsel had seen him talking to anyone.

The petitioner claimed that trial counsel told him that he should testify to show his sympathy for the victim's family. However, counsel did not prepare him to testify and then brought up the petitioner's prior criminal history on the stand.

The petitioner testified that he felt trial counsel did not represent him properly, so he filed a complaint against him. The trial court appointed appellate counsel to represent him in post-trial proceedings and on appeal. The petitioner claimed that appellate counsel filed the same motion for new trial that trial counsel had drawn up, but the petitioner had wanted appellate counsel to raise other issues, like a double jeopardy claim. The petitioner believed he had a double jeopardy claim because he was convicted of attempted second degree murder and reckless aggravated assault, which had the same elements, but appellate counsel did not raise the issue. On cross-examination, he acknowledged that the appellate court fixed the double jeopardy problem.

Trial counsel testified that he undertook representation of the petitioner in October 2007. The petitioner's case had been set for trial on one prior occasion, so counsel anticipated a February 2008 trial date when he took over the case. Counsel met with the petitioner the day of his appointment and made arrangements to meet with the petitioner at the jail, which he did. Counsel had a lengthy discussion with the petitioner concerning what original counsel had developed as far as the evidence and availability of witnesses. Counsel also conferred with original counsel regarding "the discovery, the state of the case, the state of the investigation, whether or not there was anything left to be done." He further met with the hired investigator to determine whether there was anything left that she could do to assist in preparing for the case.

Trial counsel testified that the petitioner provided a list of possible witnesses, and counsel reviewed the previous attempts that had been made to try to locate those witnesses. Counsel recalled discussing one particular witness with the petitioner whose testimony the petitioner thought was important to the defense. However, neither counsel, original counsel, nor the investigator was able to locate that witness. Counsel stated that he discussed the facts and circumstances of the petitioner's case with him, the possible defenses and how the evidence would apply to the defenses, and what would be in the petitioner's best interest.

Trial counsel testified that he filed a motion to suppress the petitioner's statement, but his motion was denied. He was prepared for a February trial date, but the case was eventually reset to July at the request of the State. Counsel recalled that the petitioner received an offer from the State but did not want to take it and was, instead, "adamant in his defense of self-defense."

Trial counsel testified that he was aware the petitioner's house had been shot at prior to the incident in this case. Counsel reviewed the police report from that incident, and information concerning that incident came out at trial. Counsel recalled that police photographs showed that the petitioner had casts on his feet at the time he was questioned by the police. With regard to his alleged interaction with a juror during voir dire, counsel elaborated:

> [A]s part of my voir dire, there is a time in which we want to discuss with the jury the effects of -- well, the problem with the jury in a trial [is] that you can't prove a negative. And it's done quite frequently here in Shelby County, Mr. So-and-so on the jury, we were outside talking a few minutes ago and I told you my middle name and you laughed at it and said it's similar to someone in your family. Can you please tell the jury what my middle name is? We didn't talk out in the hallway is the response. No, we did. We talked out in the hallway. . . . It goes on until you say, well, then, prove it. It's only you and I.

> You and I are the only ones that can say what happened between us, and I'm accusing you -- who should have to bear the burden of proving it? Should you have to defend yourself or should I have to prove it? And we go down through that and expand on that and it helps the jury understand that the State's the one that's accusing. The State has the burden of proving their case and that a defendant on most cases can't prove that they didn't do something. And that's why -- that's why in the criminal justice system, in the Tennessee Constitution and the Federal Constitution, we require and place the burden on the [S]tate.

Trial counsel testified that he discussed with the petitioner the ramifications of testifying and, although unable to remember specifically, believed that he advised the petitioner not to testify. Counsel recalled feeling comfortable about having established self-defense through the use of the State's witnesses.

On cross-examination, trial counsel noted that there was a letter in the case file between original counsel and the petitioner discussing that they were having difficulty with locating a particular witness whom the petitioner felt was crucial to his defense. Counsel stated that it was probably true that the only witnesses the investigator interviewed were witnesses also interviewed by the police because "they wouldn't know about those witnesses if they're unknown, they would have had to have had some way to discover those witnesses." Trial counsel said that he was aware the petitioner had lived at the apartment complex where the incident occurred for only a short time, but all the witnesses who testified at trial had a long history at the complex.

Trial counsel testified that he reviewed the witness statements obtained by the investigator and the police in preparation for trial. He said that the defense made an extensive investigation to try to locate the witness whom the petitioner claimed would support his story but was unsuccessful. Counsel noted that his billing records indicated that he started the process to obtain additional funding for the investigative service but did not recall whether that was to re-interview a witness or to be available to testify at trial. Regardless, he knew that "there was a continued conversation[] between [the investigative service and him] about the investigation funding and . . . how the case was proceeding." However, he reiterated that "the case for all practical purposes had been prepared for trial on at least several occasions prior to [him] coming on."

Trial counsel testified that the name Robert Phillips sounded "vaguely familiar" as the name of the witness the petitioner specifically wanted to be interviewed. Trial counsel was not the petitioner's attorney at the time the search for Phillips took place. Counsel said that he would not have personally looked for Phillips other than to have possibly "done some research on the computer through databases" because locating witnesses was typically left

to the investigators. Counsel admitted that he did not know that Robert Phillips was listed on Wikipedia as a member of the rap group, Three 6 Mafia, and that Phillips was incarcerated at the time the investigator was supposed to be looking for him.

The petitioner's appellate counsel testified that he was appointed to represent the petitioner in the motion for new trial and appeal. Appellate counsel said that he reviewed the transcripts and discussed possible issues with trial counsel before determining the best issues to raise. Appellate counsel recalled considering a possible argument that the petitioner's convictions for reckless aggravated assault and second degree murder violated double jeopardy but concluded that the concurrent sentences resulted in no prejudice to the petitioner. Counsel elaborated:

> I think under the Denton test, you can look and if it's one incident, you look, and if there are multiple victims, I think you look at the legislative purpose and the elements of the crime and double jeopardy, it's kind of -- back at that time it was kind of a complex area, cases were going different directions on that. But I concluded that . . . the fact of the matter was the judge ran the attempted second degree murder concurrently with the reckless aggravated assault. So even if I would have won on a double jeopardy argument, it would not have changed his ultimate sentence, which was twenty years. And so, I just decided it would be better to focus on that allowing his prior conviction to come in and really focus the court's attention on that and narrow the brief as much as possible when he wouldn't have even gotten a different sentence, they would have just merged the two convictions if I raised double jeopardy.

On cross-examination, appellate counsel again explained his rationale for not raising the double jeopardy issue:

> I thought I had a strong issue on [the petitioner's being impeached with a reckless homicide conviction which was similar to the convictions for which he was on trial] and I thought I wanted to focus the Court's attention on that because that would have set aside both convictions. The double jeopardy argument simply merges them and the sentence is still the same. It doesn't really help him in the end as far as any relief on this case. So at the time, I decided just to focus on what I thought was a strong issue that would help him actually get a new trial.

After the hearing, the post-conviction court entered an order denying the petition. This appeal followed.

## ANALYSIS

On appeal, the petitioner argues that he received ineffective assistance of counsel because: (1) trial counsel failed to investigate and prepare his defense; (2) trial counsel repeatedly referred to him by his street name instead of proper name, told the jurors in his opening statement that they probably would not like the petitioner, and exhibited inappropriate behavior toward a juror; and (3) appellate counsel failed to raise a double jeopardy issue on appeal about his being convicted of attempted second degree murder and reckless aggravated assault.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's

acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

**I. Investigation and Preparation of Defense**

The petitioner first argues that he received ineffective assistance of counsel because trial counsel failed to investigate and prepare his defense of self-defense, including locating a particular witness who would support his claim. With regard to this issue, the post-conviction court found that counsel made reasonable efforts to investigate the petitioner's claims and that the petitioner did not present the testimony of the witness at the hearing whom he claimed counsel failed to locate. The record supports the post-conviction court's determinations. Trial counsel testified that "the case for all practical purposes had been prepared for trial on at least several occasions prior to [his] coming on [the case]." Even so, counsel testified to his actions upon undertaking representation of the petitioner's case and discussed how a particular witness deemed important by the petitioner was unable to be located. Although we discern no deficiency in counsel's performance, more importantly, the petitioner has failed to prove prejudice. The petitioner has not shown how any additional investigation on the part of counsel would have benefitted his case and did not present the testimony of the "crucial" witness at the evidentiary hearing whom he claimed would have supported his defense. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

## II. Conduct at Trial

The petitioner next asserts that he received ineffective assistance of counsel because trial counsel repeatedly referred to him by his street name instead of proper name, told the jurors in his opening statement that they probably would not like the petitioner, and exhibited inappropriate behavior toward a juror. The petitioner elaborates that counsel behaved inappropriately toward a juror by "accusing [the juror] of discussing the case with someone else." With regard to this issue, the post-conviction court found that counsel's use of the petitioner's street name and comment during opening statement fell within the realm of trial strategy. The court also found that it was within trial strategy for counsel to use the exchange with the juror as a way to help the jury understand that the State had the burden of proving the petitioner's guilt and that the petitioner could not prove something that he did not do. The court determined that there was no evidence that counsel's actions prejudiced the jury.

The record supports the post-conviction court's determinations. At the hearing, counsel explained that the exchange with the juror was to try to illustrate that, in most cases, "a defendant . . . can't prove that they didn't do something." In addition, we have reviewed counsel's opening statement, in which counsel said, "I'm going to tell you, you don't have to like [the petitioner], I don't think you are going to like [the petitioner]. It's not your role, not your job," as well as his referring to the petitioner at times during the trial by his nickname, "Black," as did some of the witnesses. We determine that counsel's actions fell within the realm of trial strategy, and there is no evidence that those actions caused the petitioner prejudice at trial.

## III. Double Jeopardy

The petitioner lastly argues that he received ineffective assistance of counsel because appellate counsel failed to challenge his convictions for reckless aggravated assault and attempted second degree murder as being in violation of double jeopardy. With regard to this issue, the post-conviction court found that the petitioner failed to establish how the outcome of his appeal would have been different had appellate counsel raised the issue. Upon review, there is no need to determine whether appellate counsel performed deficiently because the petitioner cannot show prejudice. On direct appeal, this court, on its own initiative, determined that the petitioner's convictions for attempted second degree murder and reckless aggravated assault were the same for double jeopardy purposes and, therefore, merged the petitioner's conviction for reckless aggravated assault into his conviction for attempted second degree murder. Therefore, the petitioner cannot show that a different course of action by appellate counsel would have achieved a different result.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that he was denied the effective assistance of counsel. Accordingly, we affirm the denial of the petition for post-conviction relief.

___________________________________
ALAN E. GLENN, JUDGE